## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**LAURA SHEEDY,**                              Chapter 13
     Debtor                               Case No. 10-16236-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LAURA SHEEDY,**
     Plaintiff
v.                                        Adv. P. No. 11-1137
**DEUTSCHE BANK NATIONAL TRUST
COMPANY AND JP MORGAN CHASE
BANK, NATIONAL ASSOCIATION**,
     Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

Two matters are before the Court:  1) the Motion for Summary Judgment filed by

Deutsche Bank National Trust Company, as Trustee for WAMU Mortgage Pass-Through

Certificates Series 2004-AR4 ("Deutsche Bank") and JPMorgan Chase Bank, N.A. ("Chase"),

as the loan servicer for Deutsche Bank (jointly, the "Defendants"); and 2) the Defendants'

Motion to Strike Forensic Audit Report.  The Plaintiff, Laura Sheedy ("Sheedy," the

"Debtor," or the "Plaintiff") filed Oppositions to both Motions.  The Court heard the

matters on  July 10, 2012 and ordered the parties to file Supplemental Briefs.  The issues

1

presented include whether the Debtor's causes of action under the Truth in Lending Act,

15 U.S.C. §§ 1601-1667f ("TILA") and Mass. Gen. Laws ch. 93A, §§ 1-11 ("Chapter 93A")

are barred by the applicable statutes of limitation and whether the Debtor has submitted

any evidence to withstand the Defendants' summary judgment motion with respect to her

count for fraud, deceit and misrepresentation.

## II. PROCEDURAL BACKGROUND AND FACTS

The Debtor filed a voluntary Chapter 13 petition on June 8, 2010.  On Schedule A-

Real Property, she listed real property located at 11 Harrington Road, Lexington,

Massachusetts (the "Property") valued at $1.1 million and subject to a secured claim in the

sum of $861,157.30.  The Debtor listed her ownership interest as follows:  "Trustee over

Cardinal Trust."  Accordingly, it is unclear whether the Debtor, in fact, has a beneficial

ownership interest in the Property and whether she is the sole trustee of the Cardinal Trust.

If she holds a beneficial interest in the Trust, that interest is personal property and should

have been listed on Schedule B-Personal Property.  On Schedule F-Creditors Holding

Unsecured Nonpriority Claims, the Debtor listed claims totaling $27,886.66.

The Debtor filed a Chapter 13 Plan on July 20, 2010 in which she stated:

The debtor contends that this mortgage loan is rescindable under the Truth
in Lending Act, Chapter 93A of the Massachusetts General Laws, and/or
general principles of equity as  stated by the Supreme Judicial Court in
Commonwealth v. Fremont. Accordingly, for present purposes, the debtors
[sic] are treating this loan as unsecured and tendering repayment as an
unsecured loan in the total of general unsecured [sic] claims, below. Through
this plan, the debtors [sic] demand rescission of the loan, and in the absence
of an order sustaining the creditor's objection to confirmation of this plan, the
mortgage will be deemed rescinded and an order discharging the debtor,

2

when recorded in the Registry of Deeds, shall discharge the mortgage.

On September 30, 2011,  Chase filed a Motion for Leave to Amend Proof of Claim. The

Debtor filed a Response in which she did not object to the Motion but cautioned that she

did not waive any issues raised in this adversary proceeding.  The Court granted the

Motion on October 25, 2011.  The amended claim, which lists Chase as the creditor, sets

forth a secured claim in the sum of $842,908.47[1] with an arrearage of $56,735.77. The

original claim listed Deutsche Bank as the creditor.  Chase attached to the amended proof

of claim a document captioned, "Transfer of Claim Other Than for Security" pursuant to

which Deutsche Bank transferred the claim to Chase, as well as a copy of a

"Fixed/Adjustable Rate Note," a Mortgage, and an Assignment dated January 26, 2010.

On April 26, 2011, the Debtor filed a Verified Complaint against the Defendants,

commencing the present adversary proceeding.  In her Complaint, she made the following

---

[1] The total balance is broken down as follows:

| TOTAL DUE AS OF June 21,2010 | | |
|---|---|---|
| Principal | $ | 804,907.51 |
| Interest | $ | 24,672.13 |
| Accumulated Late Charges | $ | 486.60 |
| Property Inspection Fee | $ | 65.10 |
| Foreclosure Fees | $ | 1,300.00 |
| Foreclosure Costs | $ | 1,963.70 |
| Bankruptcy Fees | $ | 500.00 |
| Escrow | $ | 9,013.43 |
| TOTAL BALANCE OWED: | $ | 842,908.47 |

3

allegations, which this Court paraphrases, and in some instances quotes, as follows:

> Sheedy and/or her husband first acquired the Property in or about 1987. Since then, title has been transferred by Sheedy several times to a real estate trust and/or her husband for purposes of refinancing the purchase money mortgage, or for other legitimate purposes.

> In 2003, Sheedy conveyed the property from the Cardinal Trust to herself by deed recorded in the Middlesex South Registry of Deeds for the purpose of refinancing the mortgage then encumbering title to the property. She refinanced with Washington Mutual Bank, FA.

> Approximately one year later, Sheedy was induced to refinance the mortgage again. This mortgage was recorded on April 21, 2004 and was also given to Washington Mutual Bank.

<div align="center">***</div>

> Although Sheedy and her husband considered themselves relatively sophisticated in real estate matters (but not finance), they began to suspect that they had been misled about the terms of the mortgage. "In order to ascertain whether the loan transaction appeared to conform to legal requirements, they retained a mortgage fraud investigation firm, MFI-Miami, to analyze the documents."

> Upon information and belief, MFl-Miami is a Boynton Beach, Florida, firm founded by Steve Dilbert ("Dilbert"), that is regularly engaged in the business of providing forensic audit reports of mortgage transactions, but is not engaged in the practice of law.

> Dilbert provided Sheedy with a comprehensive analysis of the 2004 transaction with Washington Mutual Bank.

> In the analysis, Dilbert states that he requested from Washington Mutual Bank, but did not receive, numerous documents relating to the transaction.

> In his conclusion, Dilbert states, in part, that "[t]here are serious problems with the way this loan was originated. The majority of which were committed by the lender. It contains elements of illegal bait and switch and deception [sic] practices."

"Sheedy adopts Dilbert's conclusions as her own.  For example, on page 3 of his analysis, Dilbert states that the Truth in Lending statement, a copy of which is attached at page 113 of the analysis, is contradictory to the terms of the loan. It states that the payment about beginning on [sic] 61st payment (i.e., at the first interest rate change would be $4,331.44.  In fact, the payment $4,055.05."

The TIL [Truth in Lending Act] statement also states that the initial payment would be $2,446.88, when in fact the Note provides that the initial payment was $4,109.56.  Although the TIL statement is based on $2,446.87, it does not disclose that that amount represents interest only.

Realizing that she was in imminent danger of default, Sheedy contacted Chase in 2009, which was servicing the loan, about a modification or some other arrangement to avoid default and foreclosure, but was told that because she was making the payments, Chase would not assist her. Further attempts to resolve the problem proved equally fruitless.

In 2010, Deutsche Bank, claiming to be the owner of the loan, commenced foreclosure activities.

In order to avoid foreclosure and have an opponunity to resolve the issues, Sheedy commenced a chapter 13 bankruptcy case on June 8, 2010.

She filed a chapter 13 plan on or about July 21, 2010. In the plan, Sheedy alleged that the mortgage was rescindable pursuant to the Truth in Lending Act, Chapter 93A of the Massachusetts General Laws, and general principles of equity under Massachusetts law.

The plan also provides for tender of the principal amount by way of an unsecured claim.

Deutsche Bank objected to confirmation and generally denied Sheedy's allegations.

Based upon the foregoing allegations, the Debtor formulated five counts as follows:  Count I - Rescission pursuant to TILA; Count II - Chapter 93A; Count III - Fraud, Deceit and Misrepresentation; Count IV - Objection to Claim; and Count V - Standing of Deutsche

Bank.  Notably, the Complaint is devoid of any specific references to particular sections of

TILA or Chapter 93A.

The Debtor adopted Dilbert's Forensic Audit Report to support the allegations set

forth in her Complaint.   The so-called Forensic Audit Report contains several terse

conclusions interspersed with voluminous references to, and verbatim reproductions of,

various consumer protection laws and regulations.   For example, Dilbert stated that he

believed the following:

> Lender's actions in negotiation and execution of the loan documents
> contained all the elements necessary to render the mortgage contract void for
> fraud and misrepresentation.   Lender through affirmative statements and
> material misrepresentations regarding the essential terms of the proposed
> terms of the proposed mortgage [sic] (the true price of the loan, the
> attempted waiver of consumer protections) reasonably induced Client's
> signature.

Dilbert listed documents he requested but did not receive from Chase, including the initial

loan application and final loan application; the executed notice of right to cancel; final

closing statements; and "[a]ny and all income documents provided by borrower to

corroborate their income [sic];" a copy of the loan payment history, and copies of executed

pooling and servicing agreements.   The Forensic Audit Report, which was based on

"information provided by Applicant(s) in accordance with the Terms and Conditions of the

Mortgage Fraud Investigation Agreement," contained no information about Dilbert's

educational background or credentials.   Moreover, Dilbert did not sign the Report under

penalty of perjury.

The Debtor's Complaint concerns a 2004 loan transaction. On April 16, 2004, the

Debtor, as sole owner of the Property, executed a promissory note (the "Note") in favor of Washington Mutual Bank, FA, as lender, in the original principal amount of $810,000 (the "Refinance Transaction"). On April 21, 2004, to secure repayment of the Note, the Debtor executed a mortgage on the Property (the "Mortgage"), which was duly recorded in the Middlesex South Registry of Deeds.[2] The Property is the primary residence of the Debtor and her spouse, Thomas Sheedy.

The Note has an adjustable interest rate. Pursuant to an "Addendum to Fixed/Adjustable Rate Note," executed in conjunction with the Note, the Debtor was required to make interest only monthly payments of $2,446.87 during the first five years of the loan term.[3] The Debtor previously had obtained variable rate loans secured by the Property in 1993 for $240,000, in 1994 for $500,000, in 1997 for $600,000, in 1999 for $750,000, and in 2003 for $795,000 (the "2003 Loan"). The Debtor obtained the 2003 loan from Washington Mutual Bank, FA, and the Refinance Transaction paid off that loan. The proceeds of the Refinance Transaction were applied as follows: $798,191.83 toward the outstanding principal balance and the earned unpaid finance charge on the 2003 Loan; $2,460.30 toward real estate taxes; $7,063 toward fees related to the loan; $804.50 toward interest; $786.17 toward reserves for taxes; $550 toward the settlement fee; $150 toward the title examination; $1,215 toward title insurance; $250 toward recording costs; and $140

---

[2] Neither the Plaintiff nor the Defendants explained why the Note and Mortgage were executed several days apart.

[3] Without the Addendum, the Note called for monthly payments of $4,109.56 through the first day of May 2009.

toward additional settlement charges.   The Debtor certified that the Settlement Statement was a true and accurate statement of all receipts and disbursements made in the Refinance Transaction.

The Truth in Lending Disclosure Statement, which the Debtor executed on April 16, 2004, provided in capital letters:  "Variable rate: Your loan contains a variable-rate feature. Disclosures about the variable-rate features have been provided to your earlier."  The Plaintiff also acknowledged receipt of the Consumer Handbook on Adjustable-Rate Mortgages and the appropriate "Adjustable Rate Mortgage Loan Disclosure Statement" in writing.   The Adjustable Rate Mortgage Loan Disclosure Statement contained an explanation that (1) the interest rate would generally be based on an index, (2) the initial interest rate might be lower than the sum of the margin plus the index, and (3) the initial monthly payment for the first sixty months of the loan would consist solely of interest. The Adjustable Rate Mortgage Loan Disclosure Statement further explained how the interest rate and monthly payments could change.   The Note and the "Fixed/Adjustable Rate Rider" explained the index and the calculation of the interest rate.   The Plaintiff also was informed of her right to receive a copy of the appraisal report.

As the Debtor stated in her Complaint, she considers herself to be more sophisticated in real estate matters than the average person because she is employed in that field.  She has held a real estate broker's license since the early 1980s and has worked in real estate for thirty years.  Moreover, she has obtained loans in connection with her real estate business.  When the Debtor learned about the interest-only loan product for the

8

Refinance Transaction, she thought that it "was quite amazing" and advantageous. Additionally, the Debtor stated that she and her husband were "in a good financial situation at the time, and . . . had an offer on the property of 1.6 million." The Debtor thought that "a 50 percent loan to value was not something that would jeopardize [her] family or [her] home."

The Debtor and her husband reported total income of $203,378 on their 2004 federal income tax return. On a Uniform Residential Loan Application, dated April 15, 2004, which was executed by both the Debtor and her spouse, the Debtor, however, represented that her gross monthly income was $14,975; her husband represented that his gross monthly income was $15,000. The Plaintiff indicated at her deposition that she considered making payments on the principal balance of the Note during the first five years of the loan term, but she elected not to do so.

The Debtor transferred title to the Property to the Cardinal Trust in October 2007.[4] She testified at her deposition that she no longer owns the Property. The record is devoid of evidence as to the identify of the beneficiaries of the Cardinal Trust or the terms of the trust. The Plaintiff stopped making payments on the loan in 2009.

Washington Mutual Bank, FA endorsed the Note in blank. According to Victoria

---

[4] The Court recognizes that the transfer of the Property from the Debtor to the Cardinal Trust may have terminated the Debtor's rescission rights pursuant to 15 U.S.C. § 1635(f) which provides, subject to certain exceptions, "An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor. . . ."

L. Viviano, Sr. Research Specialist at Chase, Deutsche Bank is the current holder of the

Note.[5]    The Debtor's loan is listed on the mortgage loan schedule to the Pooling and

Servicing Agreement ("PSA") among Washington Mutual Mortgage Securities Corp.,[6]

Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company

Delaware, as Delaware Trustee, dated May 1, 2004 (the "PSA") as Loan No. ******9818.

According to the Defendants, the PSA served as a written assignment of the loan and the

Mortgage. Deutsche Bank is the trustee under the PSA; Washington Mutual Bank fsb acted

as the custodian under the PSA. The Note was transferred to Deutsche Bank on May 1,

2004. Washington Mutual Bank fsb was the custodian of the Note on behalf of Deutsche

Bank from May 1, 2004 until September 25, 2008.

Pursuant to a Purchase and Assumption Agreement between the Federal Deposit

---

[5] She stated:

The Note was executed by the Plaintiff on April 16, 2004 in favor of
Washington Mutual Bank, FA.  The Note was transferred to Deutsche
Bank, as Trustee for WAMU Mortgage Pass-Through Certificates Series
2004-AR4, on May 1, 2004.  Washington Mutual Bank fsb was the
custodian of the Note on behalf of Deutsche Bank, as Trustee for WAMU
Mortgage Pass-Through Certificates Series 2004-AR4 from May 1, 2004
until September 25, 2008.

Chase became the custodian of the Note on behalf of Deutsche Bank, as
Trustee for WAMU Mortgage Pass-Through Certificates Series 2004-AR4,
on September 25, 2008.  Since that date, the Note has remained in the
physical custody of Chase as the custodian of Deutsche Bank, as Trustee
for WAMU Mortgage Pass-Through Certificates Series 2004-AR4.

[6] The PSA contained the statement that Washington Mutual Mortgage Securities
Corp., the depositor and Master Servicer, was the owner of the Mortgage Loans and the
other property being conveyed by it to the Trust."

10

Insurance Corporation (the "FDIC"), Receiver of Washington Mutual Bank, and Chase, dated September 25, 2008, which will be discussed more fully in the context of Count V of the Complaint, Chase acquired certain assets, including all loans and loan commitments, of Washington Mutual Bank from the FDIC acting as Receiver.  In an Affidavit, Robert C. Schoppe, the Receiver in Charge for FDIC as Receiver of Washington Mutual Bank,  the Office of Thrift Supervision and the FDIC closed Washington Mutual Bank, which was formerly know as Washington Mutual Bank, FA on September 25, 2008 and thereafter Chase became the owner of Washington Mutual Bank's "loans and commitments by operation of law." The FDIC, however, retained "liability to any borrower for monetary relief . . . related in any way to any loan or commitment to lend made by [Washington Mutual Bank] prior to failure . . . ." Chase became the custodian of the Note on behalf of Deutsche Bank on September 25, 2008.  The Note has remained in the physical custody of Chase as the custodian of Deutsche Bank since that date.  Chase is the loan servicer for Deutsche Bank.

Deutsche Bank owns the Mortgage as a result of an assignment, dated January 26, 2010.  Chase, as successor in interest from the FDIC, as Receiver for Washington Mutual Bank f/k/a Washington Mutual Bank FA., executed an assignment of the Mortgage to Deutsche Bank, which was recorded in the Middlesex South Registry of Deeds on February 5, 2010.  Deutsche Bank, transferred its claim to Chase, as the loan servicer, on May 5, 2011, with a May 1, 2011 effective date.  Chase and Deutsche, through the Affidavit of Jon S. Davis, Esq. of the firm of Stanton & Davis, submitted invoices to document the property

11

inspection fees, foreclosure fees and costs, and bankruptcy fees included in the filed proof of claim.

With respect to Count I for rescission, the Debtor relies upon the Forensic Audit Report prepared by Dilbert, particularly his conclusion that "the Clients [the Debtor and her spouse] did not receive a copy of their initial application within 72 hours of signing their application."

The Debtor's husband, Thomas Sheedy, who executed the Note, but not the Mortgage, in his Affirmation, stated that "[a]ccording to my records, I did not receive any such Notice [of Right to Cancel] at the closing even though I signed the Promissory Note and other documents." The Debtor, however, stated that "[a]ccording to my records, I received two copies [of the Notice of Right to Cancel] at the closing."

With respect to Count II - Chapter 93A, the Debtor relies upon the Forensic Audit Report which provides that "[w]ith this mortgage having an adjustable rate feature, any proposed payment after the first recast date would be impossible to accurately predict because there is no way of knowing what the CMT Index (which the recast rate is based on) will be 60 months in the future."

For purposes of Count III - Fraud, Deceit, and Misrepresentation, the Debtor relies upon the Forensic Audit Report for the proposition that any proposed payment after the first recast date would be impossible to accurately predict because the mortgage has an adjustable rate feature.

## III. SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr P. 7056. "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. A fact is 'material' if it has the potential of determining the outcome of the litigation." Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012) (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009)).

The non-movant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). They "must be able to point to specific, competent evidence to support [their] claim." Id. (quoting Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 18 (1st Cir. 1998)).  In evaluating the evidence, the court "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor while safely ignoring conclusory allegations, improbable inferences, and unsupported speculation." Collins v. Univ. of N.H., 664 F.3d 8, 14 (1st Cir. 2011) (alteration in original) (internal quotation marks omitted).

## IV. THE MOTION TO STRIKE

The Defendants moved to strike the Forensic Audit Report prepared by Dilbert.

They contend correctly that " Mr. Dilbert . . . failed to demonstrate that he is qualified to testify as an expert." The Defendants add that in his Report Dilbert admitted that he had not reviewed many, if not most of, the relevant documents in this case. Accordingly, they contend the report fails to meet the evidentiary standard of Federal Rule of Evidence 702, made applicable to this adversary proceeding by Bankruptcy Rule 9017.

In response, the Debtor argues the following:

> As to the author's qualifications, Sheedy does not disagree that the author could have been more informative about his qualifications. However, the report quotes the statutes and regulations upon which he relied, as well as some case law. The court can easily infer, therefore, that he has some training and experience in the area as to which he is venturing an opinion. Since Sheedy is not submitting the Report in support of summary judgment in her favor (although it may be warranted on other grounds), it does not prejudice the defendants for the court to at least take judicial notice of it. Furthermore, striking it would be unduly prejudicial to Sheedy since the motion to strike was filed only about a half hour prior to the hearing; had Sheedy had sufficient notice of the issue, she could have obtained (or at least attempted to obtain) a revised Report from Mr. Dilbert giving his qualifications.

The Debtor relies upon Dilbert's Forensic Audit Report in opposing summary judgment as the report is the foundation upon which her Complaint rests, and she does refer to the Complaint in her opposition to the Defendants' Motion for Summary Judgment. Indeed, without the Forensic Audit Report, the grounds for the Debtor's Complaint crumble.

The court in <u>Fidler v. Central Coop. Bank (In re Fidler)</u>, 210 B.R. 411 (Bankr. D. Mass. 1997), *vacated in part*, 236 B.R. 734 (Bankr. D. Mass. 1998), observed the following with respect to affidavits used in the summary judgment context:

14

The use of opinion evidence in the form of an affidavit is also appropriate to support a motion for summary judgment. PNC Bank v. Liberty Mut. Ins. Co., 912 F.Supp. 169, 177 (W.D. Pa. 1996). Only opinion testimony that would be admissible at trial, however, may be considered. Accordingly, a court must disregard an expert affidavit where the affidavit is "essentially conclusory" and lacks specific facts. Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1144 (3d Cir. 1990) (quoting Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985)). See also Mapco, Inc. v. Carter, 573 F.2d 1268,1282 (Em. App. 1978), cert. denied, 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978). In addition, a trial court has broad discretion to rule on the admissibility of the expert's evidence. Washington v. Armstrong World Industries, Inc. 839 F.2d 1121, 1123 (5th Cir.1988); Crawford v. Worth, 447 F.2d 738, 740–41 (5th Cir.1971). It may inquire into the reliability and foundation of any expert's opinion to determine its admissibility. Soden v. Freightliner Corp., 714 F.2d 498, 502–503 (5th Cir. 1983). Finally, it is within the Court's discretion to both strike portions of an affidavit which do not conform to the standards of Rule 56(e) and to preserve those portions of those portions of the affidavit which would be admissible at trial. 11 Jeffrey W. Stempel, Moore's Federal Practice § 56.14[l][d] (1997).

In re Fidler, 210 B.R. at 422.  See also In re Ludlow Hosp. Soc., Inc., 216 B.R. 312, 321 n.11(Bankr. D. Mass. 1997)(affidavit must "(1) be made on personal knowledge, (2) set forth such facts as would be admissible in evidence, and (3) show affirmatively that the affiant is competent to testify to the matters stated therein.").  The court in Fidler added: "professional education is not a prerequisite to qualify as an expert witness. One can qualify as an expert witness based upon practical experience as well." Id. (citing Southern Cement Co. v. Sproul, 378 F.2d 48, 49 (5th Cir. 1967), and Grain Dealers Mut. Ins. Co. v. Farmers Union Coop. Elevator & Shipping Assn., 377 F.2d 672, 679 (10th Cir. 1967)).

Dilbert's Forensic Audit Report is devoid of information as to his qualifications to express opinions as to the Refinance Transaction in this case.  Dilbert did not sign the Report under penalty of perjury.  The vast body of the Report is nothing more than a string

15

of citations to statutes and regulations, many of which, such as those referencing the

Massachusetts Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 1 et seq., are

inapplicable to the Finance Transaction.   The findings contained in the Report are

conclusory and in one instance completely devoid of evidentiary support for a finding of

fraud, deceit and misrepresentation.  In particular, the Court finds that Dilbert's belief that

"the Lender's actions in negotiation and execution of the loan documents contained all the

elements necessary to render the mortgage contract void for fraud and misrepresentation"

is without  merit.  Accordingly, the Court shall enter an order striking the Forensic Audit

Report.

## V. DISCUSSION

### A. Count I -TILA

In Count I, the Debtor, while stating that the Refinancing Transaction violated

"various sections of the Truth in Lending Act,"  failed to reference any particular sections

of that Act, 15 U.S.C.§ 1601 et seq., relying instead upon the Forensic Audit Report.  In her

brief, citing 12 C.F.R. § 226.23(a)(3), she recognized that the right to rescind expired three

years after consummation of the Finance Transaction or upon transfer of all the consumer's

interest in the property or upon sale, whichever occurs first.  Nevertheless, she maintained

that she has a right of rescission under Chapter 93A and "[t]his right of rescission under

Chapter 93A would constitute a preservation of the right to rescind in recoupment."[7]

---

[7] "Rescission essentially restores the status quo ante; the creditor terminates its
security interest and returns any monies paid by the debtor in exchange for the latter's
return of all disbursed funds or property interests." McKenna v. First Horizon Home

Notably, the Debtor did not seek damages pursuant to 15 U.S.C. § 1640(a). Pursuant to

§1640(e), any action for damages must be brought within one year from the date on which

the first regular payment of principal is due under the loan, i.e May 1, 2009.[8]

The Debtor's claims against the Defendants under the TILA and Chapter 93A are

barred by the applicable statutes of limitation.  In addition, the Court finds that the Debtor

failed to provide the Defendants with a proper demand under Chapter 93A and her

---

Loan Corp., 475 F.3d 418, 421 (1st Cir. 2007)(citations to the statute omitted).  According
to the Court in In re Fidler,

> "[R]ecoupment is in the nature of a defense arising from some feature of
> the transaction upon which the plaintiff's action is grounded." Bull v.
> United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). "As
> developed at common law, the doctrine of recoupment permits the
> crediting of reciprocal rights against each other where those rights arose
> under the same transaction, typically the same contract." Mohawk
> Industries, Inc. v. United States of America (In re Mohawk Industries,
> Inc.), 82 B.R. 174, 176 (Bankr. D. Mass. 1987). To demonstrate that a claim
> is being asserted in recoupment the following elements must be
> established: "(1) The TILA violation and the creditor's debt arose from the
> same transaction, (2) [The claimant] is asserting her claim as a defense,
> and (3) the 'main action' is timely." Smith v. American Financial Systems,
> Inc. (In re Smith), 737 F.2d 1549, 1553 (11th Cir.1984). See also Coxson v.
> Commonwealth Mortgage Co. of America, L.P. (Matter of Coxson), 43
> F.3d 189, 193 (5th Cir. 1995); In re Botelho, 195 B.R. 558, 563 (Bankr. D.
> Mass. 1996).

Fidler, 210 B.R. at 420.

[8] Section 1640(e) provides in pertinent part:  "This subsection does not bar a
person from asserting a violation of this subchapter in an action to collect the debt
which was brought more than one year from the date of the occurrence of the violation
as a matter of defense by recoupment or set-off in such action, except as otherwise
provided by State law."  15 U.S.C. § 1640(e).

17

reference to that statute in her Chapter 13 plan does not comply with the requirements or the intention of Mass. Gen. Laws ch. 93A.

"Congress enacted the TILA in 1968 'to assure a meaningful disclosure of credit terms'" and 'to protect the consumer against inaccurate and unfair credit . . . practices.'"[9] Palmer v. Champion Mortg., 465 F.3d 24, 27 (1st Cir. 2006) (citing 15 U.S.C. § 1601(a)). "To this end, the TILA requires creditors to disclose clearly and accurately all the material terms of a credit transaction." Id. (citing Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998)).   With respect to non-purchase-money mortgages on residential dwellings, TILA confers upon the debtor a right to rescind within three days of the transaction's consummation or three days from delivery of the material disclosures, whichever occurs later. *See* 15 U.S.C. § 1635(a). The creditor must clearly disclose this rescission right to the debtor. *See* 12 C.F.R. § 226.23(b)(1). If a creditor fails to deliver any of the required material disclosures (including notice of the right to rescind), the debtor may rescind at any time up to three years following the consummation of the transaction. *See* id. § 226.23(a)(3). If a creditor does not respond to a rescission request within twenty days, the debtor may file suit in federal court to enforce the rescission right. *See* Belini v. Wash. Mut. Bank, 412 F.3d 17, 20 (1st Cir. 2005); *see also* 15 U.S.C. § 1635(b).

The parties do not dispute that TILA and Regulation Z exclusively apply to the

---

[9] Regulation Z requires that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Among the disclosures that must be made are the APR, *see* 12 C.F.R. § 226.18(e), the finance charge, see id. § 226.18(d), and the payment period, *see* 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 226.18(g).

Refinance Transaction; the Debtor has not asserted a claim under the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1-34 (the "MCCCDA"). In moving for summary judgment, the Defendants rely upon the three-year statute of limitation. The Refinance Transaction is exempt from rescission under section 1635(f), 12 C.F.R. § 226.23(a)(3), and the United States Supreme Court's decision in <u>Beach v. Ocwen Fed. Bank</u>, 523 U.S. 410, 419 (1998) (TILA "permits no federal right to rescind, defensively or otherwise, after the 3-year period of § 1635(f) has run"). The Debtor consummated the Refinance Transaction with Washington Mutual Bank, FA in April of 2004 and thus the right to rescind expired in April of 2007, long before the Debtor commenced her Chapter 13 case and her adversary proceeding against the Defendants.

B. <u>Count II - Chapter 93A</u>

The Defendants seek summary judgment with respect to Count II based upon the Debtor's failure to make a proper demand prior to commencing suit and the applicable statute of limitation. In response, the Debtor argues that she retains a right to rescind, relying upon Chapter 93A. She states:

> The defendants err in stating that "the limited preservation of the right of rescission in recoupment under state law in § 1635(i) does not apply here because the Plaintiff has not established a right of rescission based on Massachusetts law." . . . Sheedy does have a right of rescission under Chapter 93A of the Massachusetts General Laws. *See, e.g.*, <u>Schwartz v. Rose</u>, 418 Mass. 41 (1994); <u>Ann & Hope, Inc. v. Muratore</u>, 42 Mass.App.Ct. 223 (1997). This right under Chapter 93A would constitute a preservation of the right to rescind in recoupment. As explained below, Washington Mutual engaged in fraud, deceit, and misrepresentation when the Refinance Transaction took place. Verified Complaint ¶ 40.

The Court rejects the Debtor's argument.

In her Complaint, the Debtor alleged that "[t]he actions of Deutsche Bank, through its servicing agent, . . . were unfair and deceptive with in the meaning of Chapter 93A of the General Laws." It is unclear whether she asserted a Chapter 93A violation for refusing her rescission request or for violations of TILA. In any event, she failed to reference any particular sections of Chapter 93A, her conclusory reference to upon <u>Commonwealth v. Fremont Inv. & Loan</u>, 452 Mass. 733 (2008), is misplaced,[10] and as noted above her TILA Count fails.

Assuming that the Debtor can assert claims against the Defendants despite the provisions of the Purchase and Assumption Agreement, and assuming that rescission is an appropriate equitable remedy for the conduct of which the Debtor complains, the Court finds that Count II is barred because the applicable statute of limitation expired and the Debtor failed to comply with Mass. General Laws ch. 93A, §9. Section 9 provides in pertinent part the following:

(1) Any person, other than a person entitled to bring action under section

---

[10] The Debtor references the Borrower's Interest statute, Mass. Gen. Laws ch. 183 § 28C in support of her Chapter 93A claim. She did not bring a count under that statute, and accordingly, the Court does not find it pertinent to her Opposition to the Motion for Summary Judgment, particularly where she opted to make interest only payments for five years. Similarly, the Court rejects the Debtor's reliance upon <u>Commonwealth v. Fremont Inv. & Loan</u>, 452 Mass. 733 (2008), a case involving subprime loans to low income borrowers, many with 100% loan-to value ratios, a far different circumstance than the 50% loan to value ratio in this case, where the Debtor and her spouse reported monthly income of approximately $30,000. The Court also observes that the Debtor and her spouse overstated their income in their Loan Application, a circumstance that undermines the merits of any Ch. 93A claim.

eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

* * *

(3) At least thirty days prior to the filing of any such action, *a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered*, shall be mailed or delivered to any prospective respondent. . . . The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. . . .

Mass. Gen. Laws ch. 93A, § 9.  This Court finds that the Debtor's statement in her Chapter 13 plan "that this mortgage loan is rescindable under the Trust in Lending Act, Chapter 93A of the Massachusetts  General Laws, and/or principles of equity  . . ." does not constitute a written demand that complies with either the language or goals of the statute. A '"demand letter listing the specific deceptive practices claimed as a prerequisite to suit and as a special element that must be alleged and proved.'" <u>Spring v. Geriatric Auth. of Holyoke</u>, 394 Mass. 274, 287, 475 N.E.2d 727 (1985)(citations omitted). "The twin reasons for the demand letter are, first, to encourage negotiation and settlement, and second, to control the amount of damages recoverable by the plaintiff." <u>Thorpe v. Mut. of Omaha Ins.</u>

Co., 984 F.2d 541, 544 (1st Cir. 1993). The written demand must make reference to conduct

which the plaintiff contends violates Chapter 93A, Piccuirro v. Gaitenby, 20 Mass.App.Ct.

286, 291–292, 480 N.E.2d 30 (1985), and if it does not do so, there is no right to obtain relief

for any wrongful act that is not described in the written demand. Bressel v. Jolicoeur, 34

Mass.App.Ct. 205, 211, 609 N.E.2d 94 (1993).

> This "statutory notice requirement is not merely a procedural nicety, but,
> rather 'a prerequisite to suit.'" Rodi v. New Eng. Sch. of Law, 389 F.3d 5, 19
> (1st Cir. 2004); see Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812, 333
> N.E.2d 202, 204 (1975) ("demand letter listing the specific deceptive practices
> claimed is a prerequisite to suit and as a special element must be alleged and
> proved").

Fernandes v. Havkin, 731 F.Supp.2d 103, 119-20 (D. Mass. 2010). See also Manning v. State

Farm Ins. Co., 1997 Mass.App. Div. 184, 1997 WL 672056 at *2 (Mass.App.Div.1997) ("An

adequate demand letter is a jurisdictional prerequisite to any claim brought under ch. 93A

by a consumer plaintiff. . . . A demand letter under ch. 93A must reasonably describe not

only the alleged unfair or deceptive act or practice, but also the claimed injury."); Smith v.

Jenkins, 777 F.Supp.2d 264, 267 (D. Mass. 2011)(same). See also Lacey v. BAC Home Loans

Serv., LP (In re Lacey), __ B.R. __, 2012 WL 2872050 (Bankr. D. Mass. July 12, 2012).

The reference to Chapter 93A in the Debtor's Chapter 13 plan is inadequate to

constitute a written demand. The plan contains no reference to any specific deceptive

practices. Although the Debtor referenced the Truth in Lending Act, she did not allude to

any of its specific provisions. The Defendants would be required to speculate as to what

if any conduct Washington Mutual engaged in that triggered the Debtor's reference to

Chapter 93A, particularly where the Refinance Transaction that occurred in this case is readily distinguishable from the loan transactions considered by the Supreme Judicial Court in <u>Commonwealth v. Fremont Inv. & Loan</u>, 452 Mass. 733 (2008).

In addition to the failure to send a written demand to the Defendants, the Debtor's Chapter 93A claim is barred by the statute of limitations. Under Massachusetts law, actions arising under Chapter 93A "shall be commenced only within four years next after the cause of action accrues." Mass. Gen. Laws Ann. Ch. 260, § 5A. Because the Debtor's asserted claim under TILA for rescission is barred, she cannot rely upon an alleged violation of TILA to obtain rescission under Chapter 93A in the absence of a written demand and a timely filed action. Stated another way, this Court finds that the Debtor cannot assert a right of rescission by way of recoupment under Chapter 93A where she is barred from doing so under TILA and has no cause of action under the MCCCDA.

C. <u>Count III -Fraud, Deceit and Misrepresentation</u>

With respect to the Debtor's claim for fraud and misrepresentation, fraud must be pled with particularity. The Complaint fails to plead fraud with particularity and the Debtor's Objection to the Defendants' Motion for Summary Judgment with respect to Count III fails to rectify the egregious deficiencies of the Complaint and the Forensic Audit Report with respect to the elements of fraud, even assuming the Debtor could assert such a cause of action against Chase who acquired the assets of Washington Mutual Bank from the FDIC, as Receiver, pursuant to a Purchase and Assumption Agreement which provided that the FDIC retained "liability to any borrower for monetary relief . . . related in any way

23

to any loan or commitment to lend made by [Washington Mutual Bank] prior to failure . . . ." Thus, summary judgment in favor of the Defendants is warranted on Count III.

Having granted the Defendants' Motion to Strike, the Debtor submitted no other credible evidence to establish the requisite elements of a fraud claim. Moreover, the Defendants have established that the FDIC did not assume liabilities relating to borrowers' claims pursuant to the Purchase and Assumption Agreement between the FDIC, as Receiver of Washington Mutual Bank and Chase. The Court rejects the Debtor's argument that she can assert her fraud claims against the Defendants in reliance upon 15 U.S.C. § 1641(c)("Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation.") because of the provisions of section 1641(a)(any civil action for a violation of this subchapter or proceeding under section 1607 of this title which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary."). The undisputed facts establish that "on Bank Closing, the Chartering Authority closed Washington Mutual Bank (the "Failed Bank") pursuant to applicable law and the Corporation [the FDIC] was appointed Receiver thereof." Thus, even if there were violations of TILA which were apparent on the face of the documents executed by the Debtor, which the Debtor did not point to in her papers, the acquisition of the Mortgage by Chase stemmed from Chase's acquisition of the assets of Washington Mutual Bank as a result of the failure of that bank and its closing by the

24

Office of Thrift Supervision and the FDIC, which was not a voluntary assignment of the

Mortgage by Washington Mutual.

    D. <u>Count IV - Objection to Claim</u>

    The Court finds that Count IV is ripe for determination.  As noted above, the Court

granted Chase's Motion for Leave to Amend Proof of Claim on October 25, 2011.   In

addition, Jon S. Davis, Esq., a partner in the law firm of Stanton & Davis which served as

foreclosure and bankruptcy counsel to the Defendants, submitted an Affidavit setting forth

foreclosure costs and fees billed by or to Stanton & Davis to which he attached true and

correct copies of invoices, bills, checks, and receipts.   The Debtor did not amend her

Complaint to set forth specific grounds for objection to the amended proof of claim.

Rather, in her Objection to the Motion for Summary Judgment, she stated:

> Sheedy disagrees that the documentation supports the present motion, for
> all of the reasons given, and especially because the defendants make no effort
> to explain how they are "reasonable and necessary". She also asserts that it
> does not sufficiently conform to the court's rule respecting payment of
> attorney fees. *See* <u>In re Plant</u>, 288 BR 635 (Bkrtcy. D. Mass. 2003).   In
> supporting a request for attorney fees and costs, the creditor must provide
> documentation that allows the court to determine the necessity and
> reasonableness of the fees and costs. The documentation provided
> insufficient for the court to do so [sic]. At a minimum, a genuine dispute of
> material fact exists on this issue, and the motion must be denied.

    The Court disagrees with the position espoused by the Debtor.  The amended proof

of claim and the Davis Affidavit contain sufficient information to enable the Debtor to point

to fees and costs that are unreasonable and unnecessary.  She failed to do so.  Accordingly,

the Court shall enter an order granting summary judgment on Count IV.

E. <u>Count V - Standing</u>

In support of their Motion for Summary Judgment, the Defendants submitted evidence that the Note was endorsed in blank and without recourse by Washington Mutual Bank, FA and that Deutsche Bank holds the Note, relying upon the Affidavits of Victoria Viviano, a Sr. Research Specialist at Chase, the loan servicer for Deutsche Bank. The Defendants also submitted a chart showing the chain of title to the Mortgage executed by the Debtor.

The Debtor asserted that "[t]here is no evidence that any defendant is the <u>lawful owner</u> of the promissory note." Additionally, in Count V of her Complaint, she asserted that "the assignment was not in conformity with the chain of title requirements of the trust document in that it was not made by the donor/depositor of the trust, which upon information and belief was Washington Mutual Mortgage Securities Corp., not JPMorgan Chase Bank."

The Court rejects the Debtor's assertions as there was ample, unrebutted evidence that Chase holds the Note as custodian for Deutsche Bank. It would appear that the Debtor is simply turning a blind eye to facts adduced by the Defendants that do not support her view of her case. Moreover, to the extent that the Debtor is asking this Court to find that Deutsche Bank lacks standing because "the out of time assignment to the trust in 2010 violated the requirements of the trust documents," the Court finds that she lacks standing to challenge adherence to the provisions of the PSA.

In <u>Wenzel v. Sand Canyon Corp.</u>, 841 F.Supp.2d 463 (D. Mass. 2012), the court

26

explained standing in the context of a challenge to a chain of assignments.  It stated:

> "[s]tanding is a threshold issue, determining whether the court has the power to hear the case, and whether the ... plaintiff is entitled to have the court decide the merits of the case." Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995). In order to show standing, the plaintiffs must show that (1) they suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of other parties." Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

<div align="center">***</div>

> Courts have repeatedly held that mortgagors have no standing to dispute a mortgage assignment to which they are not a party. *See, e.g.*, Fryzel v. Mortg. Elec. Registration Sys., Inc., No. CA 10–352 M, 2011 U.S. Dist. LEXIS 95114, at *41 (D.R.I. June 10, 2011) ("[F]or over a century, state and federal courts around the country [have held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment . . . [this] principle ... is well established  . . ."); Livonia Prop. Holdings, LLC v. 12840–12976 Farmington Road Holdings, LLC, 717 F.Supp.2d 724, 735 (E.D. Mich. 2010) *aff'd*, 399 Fed.Appx. 97, 102 (6th Cir. 2010) (borrower, as non-party to the assignment documents it was challenging, lacked standing under Michigan law to attack them).

Wenzel, 841 F.Supp.2d at 478-79.  The court added:

> The Court finds that the question of whether the [plaintiffs] have standing to challenge the assignment is different from the question of whether they have standing to challenge the foreclosure on the basis that Wells Fargo did not properly hold the mortgage at the time of the foreclosure. The Massachusetts Supreme Judicial Court ("SJC") recently held that in order to properly foreclose under Massachusetts law, the foreclosing party must properly own the mortgage at issue. U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 647, 941 N.E.2d 40 (2011). Judges in this District disagree as to whether Ibanez gives Massachusetts mortgagors standing to challenge a foreclosure on the basis of defects in an assignment to which they are not a party. At least one district court case suggests that Ibanez provides such standing. Rosa v. Mortg.

<div align="center">27</div>

Electronic Sys., Inc., 821 F.Supp.2d 423, 429 n. 5, 2011 WL 5223349, at *3 n. 5
(D.Mass. Sept. 29, 2011) ("Plaintiffs appear to have standing under [ Ibanez],
because the allegations [regarding assignment validity], if proven, would
render the foreclosure sale void, under Massachusetts law."). Other cases
have declined to take this approach. See, e.g., In re Correia, 452 B.R. 319, 324
(1st Cir. BAP June 30, 2011) (affirming lower court's finding that non-party
to mortgage assignment lacked standing to challenge the validity of the
assignment); Peterson, 2011 WL 5075613 at *3 ("I do not read Ibanez to
provide an independent basis for mortgagors to collaterally contest
previously executed mortgage assignments to which they are not a party and
that do not grant them any interests or rights"); Kiah v. Aurora Loan Servs.,
LLC, No. 10–40161–FDS, 2011 WL 841282, at *6 (D.Mass. Mar. 4, 2011)
(stating "difficult to see why plaintiff has standing to assert [challenge to
mortgage assignment]").

Wenzel, 841 F.Supp.2d at 479 n.16. In  Lacey v. BAC Home Loans Serv., LP (In re Lacey),

__ B.R. __, 2012 WL 2872050 (Bankr. D. Mass. July 12, 2012), this Court concluded  a debtor

had standing to challenge the validity of the foreclosure sale "to the extent that there is an

issue as to whether the entity conducting the foreclosure sale [or issuing notices of intent

to foreclose] was the actual holder of the mortgage by way of assignment at the time of the

notice and sale. Id. at *17 (citing U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 651, 941

N.E.2d 40 (2011)("there must be proof that the assignment was made by a party that itself

held the mortgage . . . the foreclosing entity must hold the mortgage at the time of the

notice and sale in order accurately to identify itself as the present holder in the notice and

in order to have authority to foreclose under the power of sale. . . .").  This Court cited with

approval the case of Bailey v. Wells Fargo Bank, NA (In re Bailey), 468 B.R. 464 (Bankr. D.

Mass. 2012), in which the court held that the debtor had standing because her argument

was not based on the breach of an underlying contract to which she was not a party, but,

28

instead, was based upon the ownership of the mortgage at the time it was purportedly assigned.  This Court stated: "A challenge to the foreclosure sale due to defects in the chain of assignments is readily distinguishable from a challenge to assignments based upon the provisions governing the executions of assignments in a PSA to which the mortgagors are not parties. Lacey, 2012 WL 2872050 at *17 (citing In re Bailey, 468 B.R. at 475–76).

In the present case, the FDIC, as Receiver, acquired the assets of Washington Mutual Bank, and, on September 25, 2008, acting as Receiver, it assigned Washington Mutual Bank's assets, including the Debtor's mortgage to Chase.  The Court notes that Washington Mutual Mortgage Securities Corp. was the Depositor under the PSA and there is no assignment from Washington Mutual Bank FA to Washington Mutual Mortgage Securities Corp. in the record.  Pursuant to Article 3.1 of the Purchase and Assumption Agreement, however, the FDIC, as Receiver, conveyed not only the assets of Washington Mutual Bank but "all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing."  Thus, to the extent that Washington Mutual Mortgage Securities Corp. acquired the Debtor's Mortgage from Washington Mutual it was transferred by the FDIC, as Receiver, to Chase on September 25, 2008.  *Cf.* Knopp v. JPMorgan Chase Bank, N.A., No. No. 1:12–CV–1428 AWI SKO, , 2012 WL 3778879 (E.D. Ca. Aug. 31 , 2012)("Plaintiffs have shown a likelihood of success on their claim for wrongful

29

foreclosure. Plaintiffs' complaint is verified and alleges that Washington Mutual transferred

Plaintiff's note to Washington Mutual Mortgage Securities Corporation and thereafter only

acted as servicer, all of which occurred prior to Chase's acquisition of Washington Mutual's

assets through the PAA [September 25, 2008 Purchase and Assumption Agreement]. . . .

Courts have found that these allegations are sufficient to call into question Chase's ability

to foreclose, and support a claim for wrongful foreclosure. . . . Defendants' interest in the

Property depends upon what was actually obtained by Chase in the PAA.").

On January 26, 2010, Chase assigned the Mortgage it acquired from the FDIC as

Receiver to Deutsche Bank. To the extent any gap in the chain of assignment existed, the

Court finds that the January 26, 2012 assignment was curative.

## VI. CONCLUSION

In view of the foregoing, the Court shall enter an order granting the Defendants'

Motion to Strike Forensic Audit Report and granting the Defendants' Motion for Summary

Judgment with respect to all counts of the Debtor's Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  September 27, 2012